Wilson Syndicate Trust (Green Valley and Eddleman Ranches) v. Commissioner. Wilson Syndicate Trust v. Commissioner.
Wilson Trust v. Commissioner
Docket Nos. 106340 and 106341.
United States Tax Court
1943 Tax Ct. Memo LEXIS 527; 1 T.C.M. (CCH) 377; T.C.M. (RIA) 43024; January 4, 1943
*527 Percy W. Phillips, Esq., 306 Southern Bldg., Washington, D.C., and James R. Wood, Esq., for the petitioner. D. D. Smith, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By these proceedings income and excess-profits tax deficiencies determined by respondent against Wilson Syndicate Trust for the amounts and years indicated are challenged: Income
Excess-Profits
Tax
Tax
Year
Deficiency
Deficiency
1936
$17,210.27
$14,696.22
1937
20,302.09
17,169.61
1938
23,701.54
17,146.71
The proceedings also challenge deficiencies in income and excess-profits tax determined against Wilson Syndicate Trust (Green Valley and Eddleman Ranches), in the amounts and for the years as follows: Income
Excess-Profits
Tax
Tax
Year
Deficiency
Deficiency
1936
$1,040.75
$1,200.82
1937
790.62
927.95
1938
458.66
440.32
The questions presented are whether the enterprise or enterprises are associations taxable as corporations under the provisions of applicable revenue laws; and, if so, whether there are one or two taxable entities and whether by reason of a prior decision of the Board of Tax Appeals and Circuit Court *528 of Appeals the present case is res judicata. Respondent has conceded that there is no liability for excess-profits tax. Findings of Fact J. B. Wilson died testate on January 27, 1920, a resident of Dallas, Texas, after having accumulated a large community estate. He left no separate property. He was survived by his widow, Laura D. Wilson, and five married daughters, Mabel Richards, Fay Munger, Bess Schoellkopf, Lucille Patullo, and Geraldine Knight. The widow declined to take under the will and claimed her community interest. It was allotted to her in a partition proceeding and consisted of real estate and personal property of the approximate value of $1,000,000. On May 21, 1920, Laura D. Wilson executed and delivered a trust instrument, the details of which are set out in a prior report of the ; they need not be fully reiterated here. By the trust deed Laura D. Wilson stated that she was the owner in fee simple of certain Dallas property therein described, out of which, in the trust instrument, she declared her desire to make provision for her five daughters. To this end she conveyed the property to her *529 sons-in-law, Roy Munger and J. Fred Schoellkopf, as trustees, "and to the survivor of them, their and his successors or successor, and their and his heirs and assigns, forever" in trust. The instrument provided that any trustee could resign at any time at his pleasure by giving written notice; that any trustee could be removed by a majority of the beneficiaries under the trust; that a vacant trusteeship could be filled by appointment by a majority in interest of the beneficiaries; that the trustee could be a natural person or a corporation authorized to execute trusts; that the powers given the trustees could be exercised by them jointly or separately or by a sole trustee; that the trustees were not liable except for fraud or misconduct involving moral turpitude. The trustees were to hold an undivided one-seventh interest in the property and in the income and revenues for the use and benefit of each of the five daughters, her heirs and assigns. The trustees were given full and exclusive possession and control over the trust property until it was disposed of or the trust terminated; they had the discretion to continue the business and joint ownership existing as to certain items *530 of the above-described property; they were to receive all rents, revenues, incomes and returns from the property; they were given the power to employ "all managers, lawyers, clerks, agents and servants that in their judgment may be necessary or desire in and about the proper management, protection and sale, or other disposition" of the property; they were to keep the trust property in good condition and repair and pay all taxes on it, "and to the extent that they may deem necessary and wise in order to protect the value of any of said property, or make it more easily disposed of to advantage, may improve the same by the erection of buildings or other structures thereon, or may buy controlling, adjoining or adjacent property; any new property so acquired to be part of the trust property hereunder"; they were to pay each trustee as compensation for his services as trustee the sum of $5,000 a year; they were to "sell or otherwise dispose of said trust property as rapidly as the same can in their judgment be done to advantage, and are hereby authorized in their uncontrolled discretion to sell, trade, exchange, or otherwise dispose of said property"; the cost and expenses of the trusteeship *531 were to be paid out of the trust income and the proceeds of the sale of trust property and the remainder of such income and proceeds was to be divided and paid by the trustees as follows: One-seventh to each of the five daughters, her heirs or assigns and two-sevenths to the grantor of the trust, her heirs or assigns. Such distributions were to be made when available but the trustees were to pay each daughter semi-annually at least the sum of $5,000 and the grantor, semiannually, at least the sum of $10,000. It was provided that the trust should continue "until all of said trust property, both that above described and such, if any, as is hereafter acquired, has been disposed of and the proceeds thereof divided as above directed, provided this is accomplished within fifteen (15) years from the date hereof." Any trust property remaining on hand at the expiration of 15 years was to be conveyed to the beneficiaries in the same proportions previously provided for distributions. It was also provided that all the beneficiaries under the trust could terminate it at any time by a written request to that effect to the trustees who were thereupon to convey the trust property to the beneficiaries *532 in the proportions above indicated. The trust agreement conveyed 10 items of real estate situated in Dallas, Texas, 4 items of which together comprised what is known as the Wilson Building property, on which is located a structure eight stories high, the first two stories of which were occupied by the Titche-Goettinger Co. at the date of J. B. Wilson's death, under a lease having about 12 years to run. The upper stories of the building constituted an office building. A part of the Wilson Building property was what is known as the annex, which was a structure 12 stories high and occupied exclusively by Titche-Goettinger under a lease having about 12 years to run. Another item known as the North Texas Building was an office building six stories high. In another item, known as the Washington Theatre Building, Fred P. Wilson owned an undivided one-half interest and in another item Fred P. Wilson owned an undivided one-fourth interest at the time of J. B. Wilson's death; and in still another known as the Elks building he owned an undivided one-half interest. Also, at the time of J. B. Wilson's death, there were outstanding against the items of real estate located at Dallas, Texas, leases *533 other than those above mentioned ranging in length from one to five years. Another item known as the Eddleman ranch was the feeder ranch and Item 10 in New Mexico was a breeding ranch. Upon the consummation of the partition mentioned Laura D. Wilson, desiring to make further provision for her daughters, also divided in kind among them the personal property above referred to. Laura D. Wilson was advised and believed that the real estate items owned by her could not then be readily sold to advantage or divided equitably among her daughters and herself without serious disputes arising, and, hence, executed and delivered the trust instruments. The trustees therein named served until October 31, 1921, on which date they resigned. On the same date the City National Bank of Dallas was appointed successor trustee by the beneficiaries of the trust, the daughters being joined by their husbands and an amendment and modification of the May 21, 1920 instrument was effected. The amendments and modifications provided that no sale should be made by the bank as trustee unless and until it was approved by formal writing by a majority in interest of the beneficiaries of the trust; the bank as trustee *534 was not to purchase other property for the trust or make improvements other than those of proper maintenance and repair without the written consent of five-sevenths in interest of the beneficiaries; the bank as trustee was not to make any reduction of rentals in the Wilson Building without approval of a majority in interest of the beneficiaries; a working arrangement with one Furneaux, more fully described hereafter, was to remain in full force and effect; arrangements for financing by the bank were set forth; Fred P. Wilson was to have the entire management and control of all the trust properties in which he owned an interest and was to collect the revenues therefrom and pay to the bank as trustee the proportion due the estate; the persons owning the other one-half interest in the property known as the Elks Club Building were to have the entire management and control of that building, and were to collect the rents therefrom and pay to the bank the proportion due the estate. It was provided that the bank was to receive the sum of $5,000 annually for its service and stated commissions on the sales of the properties made by it. The bank as trustee was to furnish an accounting every *535 three months to each of the beneficiaries. Provision was made for repayment of advances made by the bank. In the case of a sale if the proceeds were not necessary for repayment of the advances the bank as trustee was to divide the proceeds among the beneficiaries. Provisions of the original instrument to the effect that a trustee could be removed with or without cause by a majority in interest of the beneficiaries and that such a majority could fill a vacancy in the trusteeship were changed so that five-sevenths in interest of the beneficiaries were required. The instrument in question is also set forth fully in the earlier report of the Board of Tax Appeals and need not be further detailed at this point. The City National Bank of Dallas accepted the appointment as successor trustee. The City National Bank subsequently merged with the First National Bank in Dallas under the corporate name of First National Bank in Dallas. The First National Bank in Dallas resigned as trustee on December 31, 1932. The trustee from time to time intrusted the management of the Wilson Building and the North Texas Building to one W. R. Page who served as manager of these buildings and accounted to *536 the trustees. The properties in which the trust had undivided interests were intrusted to the management of the holders of the outstanding interest who respectively accounted to the trustees. The trust owned an undivided one-third interest in what is known as the Eddleman Ranch and an undivided two-thirds interest in the New Mexico ranches above referred to. At the time of the death of J. B. Wilson there was in effect a contract between him and J. H. Furneaux whereby Furneaux who owned a one-third interest in each of the ranches was to conduct and operate them and Wilson was to advance the money necessary for such operation and Furneaux was to turn over to Wilson a share of the net profits. This contract, at the time of Wilson's death, had about three years to run and the arrangement was continued by the trustees until its expiration in May, 1923, at which time it was renewed by the trustees for five years. It was found that cattle breeding on the New Mexico ranch was not profitable and that it was impossible to sell the New Mexico ranch to advantage at the time. Cattle ranching was therefore gradually abandoned and sheep ranching previously conducted thereon was enlarged and additional *537 sheep purchased with money furnished by the trustees. In the further hope of improving the chances of disposing of the property to advantage by furnishing feed for the live stock on the ranches, a dam was built in two streams on the property to impound water for irrigation of several thousand acres at an expense of about $50,000 to the trustees. The dam turned out to be a failure and before final completion was washed away. The Eddleman Ranch was used for cattle feeding which completed the sale of fat cattle on the ranch each year and the purchase of other cattle to take their place and in turn to be fed and sold. By instrument dated November 23, 1929, Laura D. Wilson transferred to her five daughters her reserved interest in the property known as the New Mexico Ranch, or proceeds derived from any sale thereof made during the life of the trust and of all her interest in the live stock on the land. By instrument dated November 25, 1929, she transferred to Roy Munger, Jr., J. Fred Schoelkopf, Jr., Jack Munger, and Wilson Schoellkopf, grandchildren, each an undivided one-fourth interest in her two-sevenths undivided interest in the properties known as the Green Valley Ranch, which *538 had been acquired shortly after the creation of the trust, and the Eddleman Ranch, or to the proceeds from the sale thereof during the life of the trust. The conveyance included her interest in all the live stock on the property. Laura D. Wilson died testate on March 2, 1932, and by her last will and testament devised all of her interest in the property in the trust estate to her five daughters in equal proportions. After receiving advice from the bank of its resignation as trustee, effective December 31, 1932, the beneficiaries of the trust and their respective spouses executed an instrument which recited in substance as follows: That Laura D. Wilson conveyed certain properties to Munger and Schoellkopf as trustees by instrument dated May 21, 1920, primarily for the purpose of providing for the method of expeditious disposition of the properties and the distribution of the proceeds among the beneficiaries; that such trust was to continue for 15 years and if trust properties remained on hand at the expiration of such period the trustees were to convey them to the beneficiaries in the proportions indicated; that Munger and Schoellkopf resigned as trustees and the bank was appointed *539 as successor trustee; that by instrument dated November 23, 1929, Louise D. Wilson conveyed to her five daughters each an undivided one-fifth interest of her two-sevenths interest in and to the trust estate in so far as the land described therein was concerned, including the live stock thereon; that by an instrument dated November 25, 1929, Laura D. Wilson conveyed to her grandchildren each an undivided one-fourth interest in her two-sevenths interest in the Green Valley and Eddleman Ranch properties; that Laura D. Wilson died testate, devising and bequeathing substantially all of her property to her five daughters; that the First National Bank had given notice of the resignation of its trusteeship, effective December 31, 1932; that "it is now apparent that the properties now held in trust under the terms and provisions of said trust conveyance of date May 21, 1920, cannot be disposed of in entirety by the date originally fixed for the termination of the trust without great sacrifice and great loss for the beneficiaries under the trust, and it is the desire of the beneficiaries under the trust to extend the trust for a period within which the properties may be disposed of at their *540 fair market value and without sacrifice, and that this may be accomplished, to appoint new trustees with such powers as will enable them expeditiously to dispose of the property of the trust estate and to divide the proceeds thereof among the beneficiaries." The instrument then provided that the daughters, their husbands and the interested grandchildren "do hereby appoint Roy Munger, Jr., and Wilson Schoellkopf as Trustees under the aforesaid trust conveyance of date May 21st, 1920, and as Trustees under the trust hereby extended and created, such appointment to take effect at 12:01 o'clock A.M. on the 1st day of January, 1933, and have granted and conveyed, and by these presents do grant and convey, unto the said Roy Munger, Jr., and Wilson Schoellkopf, Trustees, * * *" all of the properties now held in trust under the May 21, 1920, conveyance "including all properties now forming a part of said trust estate, whether conveyed by said original instrument or subsequently acquired by the trust estate." The habendum clause was to Munger and Schoellkopf as trustees "forever, in trust, however, for the uses and purposes and upon the terms, conditions and agreements set forth in said instrument *541 of conveyance of date May 21st, 1920, and upon the terms, conditions and agreements herein set forth and declared, * * *." The instrument further provided that any trustee should have the right at his pleasure to resign his trusteeship by instrument in writing delivered to his co-trustees; that any trustee could be removed by a majority in interest of the beneficiaries by formal instrument in writing; that a vacancy in trusteeship was to be filled by appointment by a majority in interest of the beneficiaries, the appointment to be a formal writing; that any trustee appointed could be a natural person or a corporation; that the powers conferred upon the trustees could be exercised by them jointly or separately or by a sole trustee; that a trustee should not be liable for acts of his co-trustee or for his own acts except in case of fraud or misconduct involving moral turpitude. It was provided that the trustee should hold for the use and benefit of each of the five daughters an undivided one-fifth interest in the properties described in the November 23, 1929, conveyance from Laura D. Wilson to her five daughters and in the income therefrom; that they should hold for the use and benefit *542 of each of the five daughters an undivided one-seventh interest in the properties described in the November 23, 1929, conveyance and in the income therefrom; that the trustee should hold for the benefit of each of the four grandsons an undivided one-fourteenth interest in the properties described in the November 25, 1929, conveyance and in the income therefrom; that as to the remainder of the above-described properties the trustees should hold an undivided one-seventh interest therein and in the income therefrom for the benefit of each of the five daughters and a two-sevenths undivided interest in such properties and the income therefrom for the benefit of the executors of the estate of Laura D. Wilson until the close of its administration, which it was provided should not be later than three years from December 13, 1932; that after the administration of the estate the trustees should hold an undivided one-fifth interest in such properties and the income therefrom for the benefit of each of the five daughters. The instrument provided that the trustees should have the following rights and powers. They were to have full and exclusive possession, management and control of the above-described *543 properties and any additional property to be acquired under the power hereinafter noted; they were to receive the rents, revenues and incomes and returns from the properties; they were to have the power to employ necessary lawyers, clerks, agents and servants for the proper management of the properties; they, with the consent and concurrence of a majority in interest of the beneficiaries, could employ a manager or managers for the properties at compensation to be agreed upon between them and a majority in interest of the beneficiaries; they were to keep the property in good condition and repair, pay taxes, "and to the extent that they may deem necessary and wise in order to protect the value of any of said property, or make it more easily disposed of to advantage, may improve the same by the erection of buildings or other structures thereon, or may buy controlling, adjoining or adjacent property, any new property so acquired to be a part of the trust property hereunder and subject to the same trusts, rights and powers"; that if any new property was acquired with the income or proceeds from the properties held in trust for the five daughters only, then the new property was to form *544 a part of the properties held in trust for them; that if any new property was acquired with income or proceeds from the properties held in trust for the five daughters and the four grandsons, it was to form a part of the properties held in trust for the five daughters and four grandsons in the proportions of one-seventh for each of the daughters and one-fourteenth for each of the grandsons; that no property should be acquired except with the approval of the majority in interest of the beneficiaries, such approval to be given by formal written instrument; that the trustees should "sell or otherwise dispose of all of the trust property as rapidly as the same can in their judgment be done to advantage, and they are authorized with the approval of a majority in interest of the beneficiaries of this trust to sell, trade, exchange or otherwise dispose of said property in such lots or parcels and for such price or consideration and on such terms as to cash or credit as to them may seem proper," the approval of the majority in interest to be by formal written instrument; that should the trustees acquire other property in trade or exchange the property so acquired was to be held in the same *545 manner as any new property acquired by purchase; that the expenses of the trusteeship should be paid out of revenues from the trust property and proceeds of sale of trust property and upon payment of all expenses the remainder of the net income and proceeds from sale was to be divided as follows: As to properties described in the November 23, 1929, conveyance from Laura D. Wilson to her five daughters, one-fifth each to the five daughters, with respect to the properties described in the conveyance of November 25, 1929, one-seventh each to the five daughters and one-fourteenth each to the four grand-children; with respect to all other properties, one-seventh each to the five daughters and two-sevenths to the executors of the estate of Laura D. Wilson until the administration is closed and then one-fifth each to the five daughters. It was further provided that the trust should continue until all trust property was disposed of and the proceeds divided as above indicated, "provided this is accomplished within ten years from the date hereof"; that if any of the property remained on hand at the expiration of ten years the trustees were to convey it to the beneficiaries in the following *546 proportions: Properties other than those described in the conveyance of November 25, 1929, were to be conveyed one-fifth to each of the five daughters; properties described in the conveyance of November 25, 1929, were to be conveyed one-seventh to each of the five daughters and one-fourteenth to each of the four grand-children. It was further provided that the trust could be terminated at any time that a majority of the daughters should desire to terminate it. Such a desire was to be evidenced by a formal instrument in writing. The December 13, 1932 agreement was drafted by an attorney for the beneficiaries. The beneficiaries stated to the attorney that their purposes were those set out in the instrument. The attorney concluded that it was better legal practice to restate the terms of the trust rather than to provide a mere extension of the term of the trust because (1) by reason of the two conveyances of her interests by Laura D. Wilson and her subsequent death the interests of the beneficiaries in the trust property were expressed in several instruments and it was believed advisable to have such interests stated in one instrument; (2) the original trust instrument as redrafted *547 in 1921 imposed certain financial obligations upon the trustee bank which were inappropriate in the case of an individual trustee; (3) the original trust instrument made reference to liabilities of Furneaux and to contracts with him and others for the operation of certain properties and these contracts were no longer in force; (4) there were certain properties in the original trusts in which the trust owned only an undivided interest which, under the earlier agreement, were to be operated by the other owner and which properties had been disposed of; and (5) certain properties of the trust had been sold. The attorney thought it would be more lawyerlike to have one document rather than to refer to a chain of documents. In the latter part of 1932 the trustees employed C. L. Maillot to manage the properties and if possible dispose of them by sale. The employment was on a year-to-year basis and under the employment contract Maillot was paid a straight salary of from $6,000 to $7,500, plus specified commissions on all sales of trust property. Maillot was an experienced real estate man who specialized in downtown Dallas real estate. He was generally regarded as the outstanding broker *548 for the sale of such property. He continued the operation of his own office after taking on the management of the trust property. At the time of his employment he was advised that the objective was to liquidate the trust estate. The commissions provided in his contract were inserted as an incentive to sell. At the time of his employment in 1932 there was practically no prospect for a sale of any downtown Dallas real estate. The Wilson Building was in bad physical condition. To the end of increasing interest of investors in the property Maillot determined that it was necessary to improve its physical condition and its class of tenants and to increase the revenues from the property. He also thought it desirable to eliminate certain easements against the property. He took steps to accomplish all these things. To make the property attractive for sale to an investor it was thought necessary to have it leased on a long-term lease to a single tenant or have the upper floors occupied by good tenants. Maillot was able to change the original long-term leases on the lower floors to short-term leases and during the years here involved there was no lease that ran for a longer term than five years. *549 Maillot solicited the interests of every large department store business which he felt might be interested in the location, including the outstanding chain department stores in the country. He also discussed the property with other Dallas real estate men and let them know that it was for sale. The trustees never quoted a price to Maillot for the Wilson Building. Maillot believed that it was bad to put a price tag on such property because it cheapened it and decreased the chances of a favorable sale. Since 1932 there have not been any sales of real estate in Dallas of property comparable in value with the Wilson Building. The only property of a value of more than $1,000,000 which changed hands was the Kirby Building. In that transaction certain second trust notes were acquired by a purchaser at a substantial discount and the property conveyed to him for the notes subject to the outstanding first mortgage of approximately $1,450,000. The Kirby Building is 16 stories high, whereas the Wilson Building is 8 stories high; the Kirby Building occupied about one-half the ground space of the Wilson Building. The property occupied by the Wilson Building is regarded as the best retail store *550 location in the City of Dallas; the land on which the Kirby Building is located is much less valuable. The following discloses in schedule form the property transactions by the trustees since the date of the creation of the original trust by Laura D. Wilson: 4-2-21
Traded North Texas Building (Item 2 in original trust instrument) for 20,398 acres known as Green Valley Ranch, on basis of $15 per acre
$305,970.00
1921
Purchased 640 acres, being property bounded on each side by Green Valley property
17,430.00
1923
Purchased 960 acres, same situation
10,487.53
1922
Sold 1/2 interest in Elks Building (Item No. 8 in original trust instrument) for
83,250.00
1927
Sold 1/2 interest in Washington Theatre Bldg. (Item No. 6 in original trust agreement) for
112,500.00
1929
Sold 529.6 acres Green Valley
19,465.40
2-10-31
Sold 5 1/2 acres Green. Valley (Right of way)
57.09
1933
Sold 9 acres Green Valley (Right of way)
138.61
1934
Beneficiaries of Mrs. Wilson's will (same as beneficiaries in trust) conveyed to trustees the property which was her home at her death, 4919 Swiss Ave., Dallas, valued at
10,000.00
1-25-27
Bought one quarter interest of Mrs. Henrietta Wilson in property at S.W. corner Main & Murphy Sts., Dallas
(Item No. 7 of original trust agreement) on
basis of $75,000, give-or-take proposal
18,750.00
4-1-37
Sold 4919 Swiss Ave. property
7,500.00
5-25-38
Sold 2 sections Green Valley Ranch
14,360.00
8-1-38
Sold Eddleman Ranch
67,594.00
1-19-39
Sold 4 sections Green Valley Ranch
46,000.00
3-3-39
Sold 4 sections Green Valley Ranch
28,314.00
7-29-39
Sold 938.6 acres Green Valley Ranch
10,324.00
8-1-39
Sold New Mexico Ranch
150,860.00
7-5-40
Sold 1/2 Section Green Valley
4,100.00
4-15-41
Sold 9 sections Green Valley Ranch
54,800.00
2-17-42
Sold 2 sections and parts of two other sections Green
Valley Ranch
29,250.00
*551 After obtaining the Green Valley Ranch by trade for the North Texas Building the trustees made an arrangement with Furneaux similar to that for the conduct and operation of other ranch properties. The Green Valley Ranch properties were operated as feeding ranches. The purchase of the 640 acres in 1921 was to round out the Green Valley property for use as a ranch. After the sales of the Green Valley Ranch properties above noted the trustees now own about one-fourth of their original holding in the Green Valley Ranch properties. The trust retained a one-fifth mineral interest in the ranch properties it sold. The sale of the undivided one-half interest in the Washington Theatre Building was to J. B. Wilson. In 1928 the trustees made 25-year leases with new tenants for the ground floor of the Wilson Building and Wilson Building Annex, to begin on the vacation of the premises by Titche-Goettinger Co., the present tenant. Prior to 1937 an offer had been made for the property at the southwest corner of Main and Murphy Streets which the trustees wished to accept. The heirs of Fred Wilson who owned a one-fourth interest in the property refused to sell and the deal was not consummated. At *552 the time there was a desirable lease on the property. Thereafter the lease expired and values decreased in that part of the city and were continuing to do so. The trustees wished to dispose of their interests and threatened to institute a suit for partition. It was thereupon agreed that the trustee would place a price upon the property and the heirs of Fred Wilson would either buy or sell at that price at their election. The trustees named a price of $75,000 for the property, which they considered low, since it was less than one-third of the price offered some years previously, in the expectation that the Fred Wilson heirs would elect to buy. They elected to sell and the trustees under the agreement paid them $18,750 for the outstanding one-fourth interest. They have not been able to sell this property since acquiring the outstanding one-fourth interest. The Eddleman Ranch properties had been acquired by the trustees on the failure of Furneaux and Eddleman to pay interest on the debt they owed for their share, in order that the trustees would be in a position to sell the ranch property. The beneficiaries were consulted with respect to the affairs of the trust and especially with *553 respect to sales of its property. The trust never issued any certificates of interest and never possessed a seal. By instrument dated January 7, 1933, J. Fred Schoellkopf, Jr., was appointed an additional co-trustee. Roy Munger, Jr., died and Maillot was appointed trustee in his place and stead by instrument dated February 4, 1935. Jack R. Munger was appointed an additional trustee on December 7, 1937. On January 9, 1926, respondent mailed a notice of deficiency to Wilson Syndicate Trust in which he determined that it was an association taxable as a corporation and that it owed a deficiency of $9,359.44 in its income and excess-profits tax for 1921. A 25 per cent penalty for failure to file a return was also asserted. The Wilson Syndicate Trust duly petitioned the Board, assigning as its sole error respondent's classification of it as an association taxable as a corporation. A similar issue was duly joined on deficiencies determined for 1922 and 1923. In its opinion reported in , the Board held that the Wilson Syndicate Trust was not an association taxable as a corporation but was to be taxed as an ordinary trust. The United States Circuit *554 Court of Appeals for the Fifth Circuit affirmed the Board in an opinion reported in . No further proceedings were taken in the case and the decision of the Board of Tax Appeals became final. At the time of the hearing herein the trustees had sold all of the property of the trust except the Wilson Building and Annex, a 25-foot strip of property on Elm Street deemed necessary to protect the light and air of the Elm Street Annex, and the property at the southwest corner of Main and Murphy Streets and about one-fourth of the Green Valley Ranch property. The Wilson Building and Annex are adjoining properties and are regarded as having greater value as a single parcel than would be the case if an attempt were made to sell them separately. The trustees distributed to the beneficiaries all of the income and proceeds from the sale of the property. The annual distributions to the beneficiaries in each of the years involved exceeded the taxable income. The following are analyses of capital changes in what respondent calls the Main Trust and in what he calls the Green Valley and Eddleman Ranch Trust: MAIN TRUST
Analysis of Changes in Capital - Per Books
Date
Dr.
Capital
1-1-33
Net income
12-31-33
Distribution of net income
1933
$ 90,269.66
Distributions in excess of net income
1933
37,780.34
Capital
12-31-33
Net income
1934
Distribution of net income
1934
$ 85,085.58
Distributions in excess of net income
26,164.42
Capital
12-31-34
Net income
1935
Distribution of net income
1935
81,890.58
Distributions in excess of net income
1935
7,520.94
Adjust prior yr. salaries
Capital
12-31-35
Net income
1936
Distribution of net income
1936
126,488.01
Distributions in excess of net income
1936
9,460.10
Capital
Net income
12-31-37
Distribution of net income
1937
138,635.24
Distributions in excess of net income
1937
13,602.17
Capital
12-31-37
Net income
12-31-38
Distribution of net income
1938
137,896.66
Distributions in excess of net income
1938
36,003.34
Capital
12-31-38
*555 MAIN TRUST
Analysis of Changes in Capital - Per Books
Balance
Cr.
Capital
Capital
$1,923,752.73
Net income
$ 90,269.66
Distribution of net income
Distritutions in excess of net income
Capital
1,885,972.39
Net income
$ 85,085.58
Distribution of net income
Distributions in excess of net income
Capital
$1,859,807.97
Net income
81,890.58
Distribution of net income
Distributions in excess of net income
Adjust prior yr. salaries
1,227.50
Capital
1,853.514.53
Net income
125,260.51
Distribution of net income
Distributions in excess of net income
Capital
1,842,826.93
Net income
138,635.24
Distritution of net income
Distributions in excess of net income
Capital
1.829,224.76
Net income
137,896.66
Distribution of net income
Distributions in excess of net income
Capital
1,793,221.42
Green Valley and Eddleman Ranches
Analysis of Capital Changes - Per Books
Capital
1-1-33
Net income
12-31-33
Distribution of net income
1933
$ 3,894.09
Distributions over earnings
1933
15,705.91
Capital
1933
Net income
12-31-34
Distribution of net income
1934
7,336.70
Distributions over earnings
1934
3,163.30
Capital
1934
Net income
1935
Distribution of net income
1935
8,661.00
Distributions over earnings
1935
789.00
Adjust prior yr. salaries
1,227.50
Capital
1935
Net income
1936
Distribution of net income
1936
8,779.33
Distributions over earnings
1936
670.67
Capital
1936
Net income
1937
Distribution of net income
1937
7,732.91
Distributions over earnings
1937
1,367.09
Capital
1937
Net loss
1938
28,517.58
Distributions over earnings
1938
69,755.00
Capital
12-31-38
*556 Green Valley and Eddleman Ranches
Analysis of Capital Changes--Per Books
Balance
Capital
Capital
$ 355.851.51
Net income
$ 3,894,09
Distribution of net income
Distributions over earnings
Capital
340,145.60
Net income
7,336.70
Distribution of net income
Distributions over earnings
Capital
336,982.30
Net income
8,661.00
Distribution of net income
Distributions over earnings
Adjust prior yr. salaries
Capital
334,965.80
Net income
10,006.83
Distribution of net income
Distributions over earnings
Capital
335,522.63
Net Income
7,732.91
Distribution of net income
Distributions over earnings
Capital
334,155.54
Net loss
Distributions over earnings
Capital
235,882.96
The "Wilson Syndicate Trust" filed fiduciary returns of income (Form 1041) for the years 1932 through 1938 with the collector for the second collection district of Texas at Dallas. The 1932 return was executed by J. Fred Schoellkopf, Jr., as co-trustee and the other returns were executed by Maillot as manager. Schedules attached to the returns indicated beneficiaries' shares of income and credits on the "Main Trust" and *557 the Green Valley and Eddleman Ranches. There is attributable to the so-called Main Trust the following net income for the years 1932 through 1938; of which the amounts shown as such were net income derived from rentals: Net
Net Income
Year
Income
from Rentals
1932
$ 79,517.50
$119,834.07
1933
82,453.81
85,494.64
1934
80,357.88
81,572.44
1935
76,746.84
86,761.26
1936
122,468.48
122,080.95
1937
143,080.06
152,150.94
1938
142,889.28
151,712.39
There is attributable to the Green Valley and Eddleman Ranch properties the following net income for the years 1935 through 1938: Year
Net Income
1932
$ 1,073.58
1933
3,851.96
1934
7,336.70
1935
8,661.00
1936
10,006.83
1937
7,732.91
1938
3,669.30
Respondent mailed two notices of deficiency to the trustees of the Wilson Syndicate Trust designating the taxpayer in one of the notices of deficiency as "Wilson Syndicate Trust (Eddleman and Green Valley Ranches)." In the one notice respondent charged the taxpayer with the income derived from the operation and sales of the properties known as the Green Valley and Eddleman Ranches. In the other notice of deficiency he included all other income. In both *558 notices he determined that the trust was an association taxable as a corporation. Opinion Respondent determined that petitioner trust was an association taxable as a corporation. The correctness of that conclusion is the sole issue in these proceedings. Although respondent in supporting his determination never clearly comes to grips with what is petitioner's principal contention, we think it may fairly be said that the decisive issue is whether or not petitioner is a liquidating trust. If it is, the well-settled rule seems to be that regardless of other attributes, the trust will not be subjected to tax as a corporation. ; ; ; ; ; (D.C. Dist. Mass.). This is apparently founded on *559 the principle that the trust is not thereby engaged in the sort of business which is the preliminary requirement of holding the enterprise comparable to a corporation for tax purposes. Cf. . There is little difficulty in dealing with this question from the standpoint of the declared purpose of the trust. The original direction to the trustees was "to sell or otherwise dispose of said trust property as rapidly as the same can in their judgment be done to advantage," and the instrument subsequently extending the trust recited that the primary purpose was that of "providing a method for the expeditious disposition of said property," and repeated the direction to the trustees to "sell or otherwise dispose of all of the trust property as rapidly as the same can in their judgment be done to advantage." The principal difficulty is that, after twenty years, salient properties of the trust remain in the hands of the trustees, giving rise to the doubt whether the original trust purpose remains effective, whether it is still true that liquidation, rather than investment income, is the primary trust purpose, whether "on the *560 other hand, the purpose, whether "on the other hand, the purpose of liquidation" has been "so obscured by the manifold business activities of the trust that the declared purpose can be said to be lost or abandoned * * *." Resolution of this problem is not without its difficulties and, were the slate clean, it might perhaps be contended that the consistent and energetic efforts made to dispose of the property and their lack of success after so long a period constitute potent evidence that the original project of liquidation has in reality now been demonstrated to be so improbable of success that the original intention must be regarded as subtly but unmistakably altered. It may well be doubted whether under such circumstances the mental attitude of trustees and beneficiaries can be other than one of resignation to the inevitable; of acceptance of the necessity of holding the property and enjoying its income; rather than of entertaining any reasonably realistic expectation that the earlier purpose of liquidation can actually be accomplished. That approach, however, we do not consider ourselves now *561 at liberty to adopt. Unsuccessful efforts to complete a liquidation extending over as long or longer spans have been considered in other cases, and the uniform result has been to conclude that the rule relating to liquidating trusts is nevertheless applicable. Helvering v. Washburn, supra, 37 years; Paine et al. v. United States, supra, 23 years; Frederick Pitzman, et al., Trustees, 18 years; Fidelity National Bank & Trust Company, supra, 10 years. If, as we think these cases show, the liquidating character of the trust is not lost by an administration covering a long period of time, there is no aspect of this situation which casts doubt upon it. It was not inconsistent with that primary objective for the trustees to hold out for an advantageous price, nor to operate the properties successfully meanwhile and procure the greatest possible income for the beneficiaries pending disposition. ;Under all the circumstances petitioner, in our *562 opinion, satisfies the requirements of a liquidating trust and as such is entitled to the benefit of the taxing provisions relating to true trusts. Respondent's determination was accordingly erroneous. Decision will be entered for petitioner.